IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HAROLD M. SINGFIELD,         *

       Plaintiff,           *

v.                      *       Civil Action No. GLR-19-2030

LIEUTENANT JAMES SMITH, et al.,  *

       Defendants.       *
                        ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants C.O. II Trey Brenneman, C.O. Sergeant Clinton Davis, C.O. Lieutenant James Smith, C.O. II James Tichinel, C.O. II Charles Roberts, and C.O. II Daniel Frenzel's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 14). The Motion is ripe for disposition and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant in part and deny in part Defendants' Motion, construed as one for summary judgment.

## I.    BACKGROUND

### A.   Plaintiff's Allegations

Self-represented Plaintiff Harold M. Singfield is incarcerated at the North Branch Correctional Institution ("NCBI"). In his Complaint,[1] Singfield alleges that Defendants acted with deliberate indifference to his safety and well-being in violation of his rights

---

[1] Singfield filed an unverified Complaint, but later submitted a declaration with his Opposition to Defendants' Motion to Dismiss averring that "[a]ll statements made by me in my complaint are true, undeniable, facts." (Pl.'s Decls. at 1, ECF No. 21-2).

under the Eighth Amendment by failing to protect him from harm by other inmates,
denying him medical care, and subjecting him to unconstitutional conditions of
confinement during the time he was housed at Western Correctional Institution ("WCI").
(Compl. at 3–4, ECF No. 1).[2] Specifically, Singfield alleges that he was placed in a cell
with an inmate, Marquise Keelz, who caused him to fear for his life; that Keelz attacked
him multiple times; and that he repeatedly brought these concerns to the attention of
Defendants and medical providers during the three weeks that he occupied a cell with
Keelz. (Id.). Singfield claims that he was denied Administrative Remedy Procedure
("ARP") forms and later subjected to retaliation for filing ARP requests. (Id. at 4).

   In his Complaint, Singfield describes a fight that he initiated on June 30, 2016, with
an inmate named Augustus Woodard. (Id. at 3; Serious Incident Rep. WCI-16-043
["Incident Rep."] at 2, ECF No. 14-4).[3] Due to an injury to his left hand that he received
during this fight, Singfield was sent to a hospital on July 1, 2016. (Compl. at 3; Pl.'s
Corizon Med. R. ["Med. R."] at 85, ECF No. 14-6). At the hospital, his hand was placed
in a cast and he was given a sling.[4] (Id.) Upon his return to WCI, correctional officers

---

[2] Citations to page numbers in the Complaint refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

[3] Woodard was placed on Singfield's enemies list on August 1, 2016, and the designation was retracted on May 8, 2018. (Pl.'s Enemy Alert & Retractions List ["Enemy List"] at 1, ECF No. 14-22).

[4] Singfield provides this information as context. He does not allege that the June 30, 2016 altercation was a result of Defendants' failure to protect him or attempt to raise claims based on this incident. Indeed, Singfield wrote an inmate statement acknowledging his responsibility for punching Woodard, admitted to a hearing officer that he assaulted Woodard, and was sanctioned with loss of ninety days of good time credits and ninety days of segregation. (Incident Rep. at 20; Inmate Disciplinary Hearing Record at 12, ECF No. 14-9).

placed him in a cell with Keelz, an inmate who was purportedly a friend of Woodard's. (Compl. at 3). Singfield "immediately informed every officer and nurse" who walked past "his cell of the situation and stressed to them that [he was] in fear for [his] life." (Id.). He notes that he expressed this concern to "Ofc. Brennaman, Ofc. Frenzle, Ofc. Davis, Ofc. Tichinel, Ofc. Roberts, Lt. Smith, Nurse Morgan, and [Registered Nurse] Karen A. Stratton[.]" (Id.). Singfield alleges he repeatedly reported his concerns to these prison officials between July 1, 2016 and July 23, 2016. (Id. at 4). He states that "[a]fter several cries for help and numerous . . . visits to the medical department, officers still refused to move [him] from this situation." (Id.). Instead of separating Singfield from his cellmates, Defendant C.O. Sergeant Clinton Davis allegedly threatened, "[i]f you complain on my shift I'm going to spray pepper spray in your face." (Id. at 3).

On July 5, 2016, Singfield had his first fight with Keelz. (Id.). Singfield reported the fight to Defendants C.O. II Trey Brenneman and C.O. II Charles Roberts, who told Singfield that he and Keelz needed "to just deal with it [them]selves in the cell." (Id.). Singfield asserts that Roberts and Brennaman refused his request to go to the medical department. (Id. at 3, 5).

---

[5] Following his fight with Woodard, Singfield was sent to the emergency room with a diagnosis of "boxers fracture" for which he was provided an ace wrap and a sling and recommended for a follow-up orthopedic consultation. (Med. R. at 84–87). During the time that he was in the cell with Keelz, Singfield was seen by medical providers on July 10, 13, and 20 for a lump in his lower left abdomen. (Id. at 73, 75). One provider suspected a hernia and advised about symptoms of strangulation. (Id.). The other provider concluded that the exam was normal. (Id.). Singfield's left hand was x-rayed on July 7, 2016. (Id. at 77). On July 6, 2016, Nurse Stratton saw Singfield for an initial behavioral health segregation visit. (Id. at 78). At that time, Singfield reported no concerns about his cellmate. (See id.). Also on July 7, 2016, Dr. Robustiano Barrera submitted an orthopedic consultation request for

Singfield's medical record shows that during a behavioral health segregation visit on July 20, 2016, Singfield told Registered Nurse Karen Stratton that he was "not doing too good. Havent slept in two days. Me and my cellie arent getting along. Im Christian, he is Muslim. Im in here for fighting with one of his Muslim brothers." (Med. R. at 69). Stratton's notes indicate that she informed Singfield that custody staff determines housing assignments and Singfield reported to her that "he ha[d] addressed [the problem] with several custody staff already." (Id.). Stratton "informed custody [staff] of current issues. Lt. Smith stated [that he] would address [the] issue." (Id.). Singfield asserts that after Stratton informed Smith about his concerns, Smith directed two correctional officers to harass him by throwing his property around the cell. (Compl. at 3). Singfield alleges that, as a result of Defendants' failure to act, Keelz beat, tortured, and tormented him physically and mentally for three weeks straight. (Id.).

On July 20, 2016, Singfield was seen by Peggy Mahler, N.P. (Med. R. at 70). Mahler's notes report that Singfield requested pain killers because his hand was hurting due to a physical altercation with his cellmate four days prior. (Id.). In his Opposition, Singfield asserts that a member of the correctional staff was present when he reported this information to Mahler. (Mem. Supp. Pl.'s Mot. Opp. Defs.' Mot. Dismiss Alt. Summ. J. ["Opp'n"] at 16, ECF No. 21-1).[6]

---

Singfield's "boxer fracture." (Id. at 79).

    [6] Courts generally will not permit plaintiffs to revise their pleadings through their briefs. See Zachair, Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D.Md. 1997) ("[Plaintiff] is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint."), aff'd, 141 F.3d 1162 (4th Cir. 1998). However, given Singfield's pro se status and the Court's decision to review Defendants' Motion as a motion

On July 21, 2016, Roy J. Carls, M.D., saw Singfield for an orthopedic consultation and wrote in his notes that Singfield had "sustained a left nondominant boxer fracture several times in the last several weeks." (Med. R. at 67). Singfield asserts he visited the nurse for pain medication on more than one occasion due to the continuous abuse. (Compl. at 3).

Singfield alleges that he was unable to sleep because he did not know when he would be attacked again. (Id.). He started to lose weight, his finger was refractured several times, he had bumps and bruises, and had to be placed on medication due to "extreme depression." (Id.). Singfield states that "[t]his abuse only stopped when Ofc. Zembower heard me screaming for dear life, in the middle of the night, from being attacked once again." (Id.). Zembower came to the cell and sprayed pepper spray in Singfield's face, "just like Ofc. Davis promised would happen if I complain on his shift." (Id.). Singfield did not name Zembower as a defendant in this case. (See id. at 1).

On July 23, 2016, following another altercation with Keelz, Singfield was sent to the medical unit. (Aug. 23, 2016 Req. Admin. Remedy at 1, ECF No. 14-25.) Singfield alleges that Nurse Carla Buck sent him away from the unit untreated, stating that "since you want to fight in the night on a weekend, you will have to wait to see a doctor on Monday." (Compl. at 4; but see Med. R. at 65 (indicating that Buck examined Singfield)).

---

for summary judgment, the Court will consider these additional allegations as though they had been asserted in an affidavit accompanying Singfield's Opposition. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("A document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]") (internal quotation marks and citations omitted).

Singfield was relocated to a different cell from Keelz that day. (Compl. at 4; Pl.'s Traffic History Excerpt ["Traffic Hist."] at 1, ECF No. 14-7). Singfield did not name Buck as a defendant in this case. (See Compl. at 1).

On August 3, 2016, after making several requests, Singfield was provided an ARP form. (Id. at 4). He alleges that officers then retaliated against him by trying to place him in a cell with his "known enemy." (Id.). Singfield refused the cell because he "did not want to relive the torture I've just been put through." (Id.). Singfield alleges that officers took his clothes and placed him in deplorable conditions. (Id.). Specifically, Singfield alleges that the officers placed him in a cell smeared with feces, without a bed, and without toilet paper, and fed him "loaf," which Singfield describes as a "balled up piece of food with many different ingredients chopped into it." (Id.). Singfield sought to press charges against all officers who were aware that he had been housed with an enemy who tortured him for weeks, but no charges were brought.[7] (Id.).

Singfield filed a declaration by Grant Haley, the inmate in the cell Singfield refused to accept, with his Opposition.[8] Haley states:

> At no time did Plaintiff make any threats towards me or my well being. Nor did he made [sic] any aggressive remarks to C.O. Wilson.

****

---

[7] Singfield has no cause of action related to the failure to criminally prosecute his assailant or Defendants. Allegations of criminal violations may only be initiated by a prosecutor. See Leeke v. Timmerman, 454 U.S. 84, 86–87 (1981); Linda R. v. Richard V., 410 U.S. 614, 619 (1973) (private citizens lack a judicially cognizable interest in the criminal prosecution of another).

[8] Grant Haley is not on Singfield's list of documented enemies. (Enemy List at 1).

> On August 5, 2016, Plaintiff and C.O. Wilson approached my cell location (with plaintiff in handcuffs) and I immediately informed C.O. Wilson that the Plaintiff and I can not be housed together because we are enemies. C.O. Wilson stated, "I don't care I'm putting him in there so ya'll can kill each other." After I refused to accept Plaintiff in my cell, C.O. Wilson became [aggravated] and aggressively pushed plaintiff down the hall to another cell.

(Pl.'s Decls. at 2).

As relief, Singfield seeks compensatory damages, punitive damages, and reimbursement for fees associated with this litigation. (Compl. at 5).

**B.    Defendants' Response**

**1.    Defendants' Declarations**

Defendants deny knowing about Singfield's fears of danger at the hands of his cell partner. Defendant Smith states that Singfield did not complain to him about his housing situation or express fear for his life relating to Keelz. (Smith Decl. ¶ 4, ECF No. 14-13). Smith denies ordering correctional staff to harass Singfield by throwing his property around his cell. (Id. ¶ 8).

Defendant Brenneman states that Singfield did not report to him that he had a fight with his cell partner on July 5, 2016. (Brenneman Decl. ¶ 4, ECF No. 14-17). Had he done so, Brenneman says, he would have removed the inmates from the cell, separated them, had them evaluated by a medical provider, and interviewed them to determine what had occurred and to determine appropriate housing. (Id.). Brenneman denies that Singfield expressed fear for his safety or complained about his cellmate. (Id. ¶ 5). Brenneman states that he has never denied Singfield access to the medical department, medical care, or an ARP form. (Id. ¶ 6).

Defendant Davis denies threatening to use pepper spray on Singfield's face for making complaints on his shift. (Davis Decl. ¶ 4, ECF No. 14-19). Davis similarly denies that Singfield "relayed to me that he was in fear for his life or that he and his cell partner Marquise Keelz were not getting along." (Id.). Davis states he has never denied Singfield an ARP form. (Id. ¶ 5).

Defendant Tichinel denies that Singfield complained to him about his housing or expressed fear for his life from his cellmate. (Tichinel Decl. ¶ 4, ECF No. 14-20). Tichinel also denies that he refused to give Singfield an ARP form. (Id. ¶ 5).

Finally, Defendant Frenzel states that at no time in July 2016 did Singfield tell him that he was in fear for his life or that he and Keelz "were not getting along." (Frenzel Decl. ¶ 4, ECF No. 14-21). Frenzel denies refusing Singfield ARP forms. (Id. ¶ 5).

### 2. July 22, 2016 Incident

Defendants attach to their Motion several exhibits regarding the physical altercations in which Singfield was involved. According to a Use of Force Report attached to the Motion, on July 22, 2016, Zembower discovered Singfield and Keelz fighting with closed fist punches in Cell #4-A-38 in the segregation unit. (Use of Force Rep. ["UOF Rep."] at 2–4, ECF No. 14-10). After the combatants ignored his orders to stop fighting, Zembower administered pepper spray through the cell door's food slot. (Id.). Both inmates stopped fighting, were handcuffed, and were taken to the medical department, where they were treated for pepper spray exposure, photographed, and given showers. (Id.). Both inmates refused to provide statements and were issued notices of rule infractions for fighting (rule #102) and failing to obey a direct order (rule #400). (Id. at 13–14). Both

inmates were placed on administrative segregation pending adjustment status. (Id.; Incident Rep. Excerpts at 3, ECF No. 14-11). Keelz was returned to Cell #4-A-38, and Singfield was moved to Cell #5-C-48. (UOF Rep. at 8–9; see also Traffic Hist. at 1). On August 17, 2016, Keelz was placed on Singfield's enemies list. (Enemy List at 1).[9]

### 3.     August 5, 2016 Incident

On August 5, 2016, Singfield told Officer Wilson, who was escorting him to Cell #4-A-17, that "If you put me in there, I'm going to fuck that guy up." (Incident Rep. Excerpts at 2). At that point, Wilson escorted Singfield to be placed on "staff alert" status for threatening to assault his cellmate and being verbally abusive toward staff. (Id.; see also Smith Decl. ¶ 5; Staff Alert Notice ["Alert Notice"] at 1, ECF No. 14-14). Defendant Smith states that all cells are inspected by staff between each inmate's use and are cleaned by inmate workers. (Smith Decl. ¶ 6). According to Smith, Singfield was provided a mattress and toilet paper while on staff alert status. (Id. ¶ 5). Smith denies that Singfield was placed in a cell covered in feces or received the special management meal, i.e., the "loaf." (Id. ¶¶ 6–7). Smith states that there is no paperwork in Singfield's file to evidence his placement on the special management meal. (Id. ¶ 7). Singfield was removed from the cell on August 8, 2016. (Traffic Hist. at 1; Med. R. at 59; Alert Notice at 2–4).

---

[9] At an adjustment hearing on August 17, 2016, Singfield pleaded guilty to violating Inmate Rules 104, 400, and 102. (Incident Rep. Excerpts at 7–10). He received a concurrent ninety-day disciplinary segregation sentence and WCI revoked ninety days of Singfield's good conduct credits. (Id.).

### 4.      ARP Requests

Singfield filed four ARPs while incarcerated at WCI. (ARP Index Rep. ["Index Rep."] at 1, ECF No. 14-23). One of those ARPs, No. WCI-1664-16, is relevant to his claims in this case. In that ARP, filed on August 2, 2016, Singfield claimed that beginning on July 1, 2016, he was housed in a cell with Keelz for three weeks, that he alerted Officers Roberts and Brenneman about his concerns, and that they denied him medical attention. (ARP No. WCI-1664-16 ["Aug. 2 ARP"] at 6–9, ECF No. 14-24).

On August 4, 2016, WCI's ARP Coordinator advised Singfield to resubmit the ARP by August 19, 2016 with written documentation that Keelz "should be or is a documented enemy," and dismissed the case pending resubmission. (Id. at 6).[10] The record is unclear whether Singfield resubmitted the ARP as directed. (See id. at 3). On September 19, 2016, Singfield filed an appeal regarding the ARP. (Id.). Carolyn Suggs, then-Commissioner of the Department of Public Safety and Correctional Services ("DPSCS"), dismissed the appeal on October 18, 2016, on the ground that it had been accepted in error. (Id. at 1). Specifically, Suggs determined that the ARP should have been procedurally dismissed for failure to follow the ARP Coordinator's instructions. (Id.; see also Index Rep. at 1).[11] There

---

[10] Keelz was placed on Singfield's enemies list on August 17, 2016. (Enemy List at 1).

[11] In ARP No. WCI-1844-16, filed on August 23, 2016, Singfield alleged that when he saw Buck on July 22, 2016, she provided no assistance for his broken hand. (Aug. 2 ARP at 1, ECF No. 14-25). Singfield further complained that he was not seen again by medical staff until August 11, 2016, when he learned that his hand was fractured. (Id. at 2). He was subsequently given medication. (Id.).

is no evidence that Singfield pursued the claims in this ARP by filing a grievance with the

Inmate Grievance Office ("IGO"). (<u>See</u> Hassan Decl. ¶ 3, ECF No. 14-26).

## II.    DISCUSSION

**A.    <u>Standard of Review</u>**

**1.    Conversion**

Defendants style their Motion as a motion to dismiss under Rule 12(b)(6) or, in the

alternative, for summary judgment under Rule 56. "A motion styled in this manner

implicates the Court's discretion under Rule 12(d)[.]" <u>Pevia v. Hogan</u>, 443 F.Supp.3d 612,

625 (D.Md. 2020) (citation omitted). Rule 12(d) provides that when "matters outside the

pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must

be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court

"has complete discretion to determine whether or not to accept the submission of any

material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion

and rely on it, thereby converting the motion, or to reject it or simply not consider it."

<u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013)

(quoting 5C Wright & Miller, <u>Federal Practice & Procedure</u> § 1366, at 159 (3d ed. 2004)).

The United States Court of Appeals for the Fourth Circuit has articulated two

requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice

and "a reasonable opportunity for discovery." <u>Greater Balt. Ctr. for Pregnancy Concerns,</u>

<u>Inc. v. Mayor of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly

captions its motion "in the alternative" as one for summary judgment and submits matters

outside the pleadings for the court's consideration, the parties are deemed to be on notice

that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)). The Court "does not have an obligation to notify parties of the obvious." Laughlin, 149 F.3d at 261.

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To successfully raise the need for additional discovery, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 954 (4th Cir. 1995)).

The Fourth Circuit has warned that it "place[s] great weight on the Rule 56[d] affidavit and that a reference to Rule 56[d] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56[d] affidavit." Harrods, 302 F.3d at 244 (quoting Evans, 80 F.3d at 961). Failing to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Id. (quoting Evans, 80 F.3d at 961). Despite these holdings, the Fourth Circuit has indicated that there are some limited circumstances in which summary judgment may be premature, notwithstanding the non-movants' failure to file a Rule 56(d) affidavit. See id. A court may excuse the failure to file a Rule 56(d) affidavit when "fact-intensive issues, such as intent, are involved" and the nonmovant's objections to deciding summary judgment without discovery "serve[ ] as the functional equivalent of an affidavit." Id. at 244–45 (quoting First Chi. Int'l v. United Exch. Co., 836 F.2d 1375, 1380–81 (D.C.Cir. 1988)).

Here, the Court concludes that both requirements for conversion are satisfied. Singfield was on notice that the Court might resolve Defendants' Motion under Rule 56 because Defendants styled their Motion in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, the Clerk informed Singfield about the Motion and the need to file an opposition. (See Rule 12/56 Letter, ECF No. 15). Singfield filed an Opposition but did not include a request for more time to conduct discovery. (See ECF No. 21). Because the Court will consider documents outside of Singfield's Complaint in resolving Defendants' Motion, the Court will treat the Motion as one for summary judgment.

###### 2.    Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140–41 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citations omitted). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

## B.    Analysis

Because Singfield is proceeding pro se, the Court liberally construes his pleadings. See Erickson, 551 U.S. at 94. Through this lens, the Court views the Complaint as raising potential Eighth Amendment claims for failure to protect from harm, denial of medical care, and unconstitutional conditions of confinement, as well as a claim for retaliation in violation of the First Amendment.

### 1.    Exhaustion of Remedies

Defendants argue that Singfield's claims must fail because he failed to exhaust his administrative remedies. (Mem. Supp. Defs.' Mot. Dismiss Alt. Mot. Summ. J. ["Defs.'

Mem."] at 20–21, ECF No. 14-1). The Prisoner Litigation Reform Act ("PLRA"), 42

U.S.C. § 1997e, provides in pertinent part that:

> No action shall be brought with respect to prison conditions
> under section 1983 of this title, or any other Federal law, by a
> prisoner confined in any jail, prison, or other correctional
> facility until such administrative remedies as are available are
> exhausted.

42 U.S.C. § 1997e(a). Thus, if Singfield has not yet exhausted the administrative remedies

available for presentation of his claims, his claims must be dismissed pursuant to the

PLRA.

For purposes of the PLRA, the phrase "prison conditions" encompasses "all inmate

suits about prison life, whether they involve general circumstances or particular episodes,

and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S.

516, 532 (2002); see also Chase v. Peay, 286 F.Supp.2d 523, 528 (D.Md. 2003), aff'd, 98

F.App'x 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional

requirement and does not impose a heightened pleading standard on the prisoner. Rather,

the failure to exhaust administrative remedies is an affirmative defense to be pleaded and

proven by defendants. See Jones v. Bock, 549 U.S. 199, 216 (2007); see also Anderson v.

XYZ Corr. Health Services, Inc., 407 F.2d 674, 682 (4th Cir. 2005). A claim that has not

been exhausted may not be considered by this Court. See Jones, 549 U.S. at 220.

Ordinarily, an inmate must follow the required procedural steps in order to exhaust

his administrative remedies. Moore v. Bennette, 517 F.3d 717, 725, 729 (4th Cir. 2008);

see also Langford v. Couch, 50 F.Supp.2d 544, 548 (E.D.Va. 1999) ("The second PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." Woodford v. Ngo, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Woodford, 548 U.S. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)).

In Maryland, filing an ARP complaint is the first step of a mandatory three-step administrative process. See Md. Code Ann., Corr. Servs. § 10-201 et seq.; Md. Code Ann., Cts. & Jud. Proc. § 12-201 et seq.; Md. Code Regs. ["COMAR"] 12.02.28.01 et seq. A prisoner in a Maryland Division of Corrections ("DOC") institution must file an ARP with his facility's managing official within thirty days of the date on which the incident occurred, or within thirty days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B). If the managing official denies the ARP, the prisoner has thirty days to file an appeal with the Commissioner of Corrections. Id. 12.02.28.14(B)(5). If the Commissioner of Corrections denies the appeal, the prisoner has thirty days to file a grievance with the Inmate Grievance Office. Id. 12.02.28.18. An inmate is not deemed to have exhausted his administrative remedies until he has pursued his grievance through all levels. See Woodford, 548 U.S. at 90; see also Gibbs v. Bureau of Prisons, 986 F.Supp. 941, 943–44 (D.Md. 1997).

Failure to exhaust may be excused in cases where the administrative procedure is not available. Ross v. Blake, 136 S.Ct. 1850, 1858 (2016) (holding that an inmate "must exhaust available remedies, but need not exhaust unavailable ones"). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008). The Supreme Court identified three circumstances when an administrative remedy is unavailable: when (1) officers are "unable or consistently unwilling to provide relief to aggrieved inmates," (2) the procedure is "so opaque that it becomes, practically speaking, incapable of use," or (3) prison administrators actively "thwart" inmates from filing grievances. Ross, 136 S.Ct. at 1859–60.

Singfield asserts that he has followed all administrative procedures. (Opp'n at 23–24). He asserts that he was denied ARP forms "for awhile" and after several days of "asking and begging" was "finally given an ARP to file his complaint." (Id. at 23). He asserts that some of his appeals received no response and that he exhausted every available administrative remedy that the institution has available for prisoners. (Id.). In his Complaint, Singfield also states that his grievance was dismissed "for procedure reasons." (Compl. at 2). Defendants, however, have provided evidence that no grievance was filed before the IGO. (See Hassan Decl. ¶ 3). Under these circumstances, a genuine dispute of material fact exists as to whether Singfield exhausted his administrative remedies. Accordingly, the case will not be dismissed on exhaustion grounds.

2.       **Eighth Amendment Claims**

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."
U.S. Const. amend. VIII; see also Estelle v. Gamble, 429 U.S. 97, 102 (1976); Gregg v.
Georgia, 428 U.S. 153, 173 (1976); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016);
King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016). It "protects inmates from inhumane
treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th
Cir. 1996).

i.       **Failure to Protect**

The Eighth Amendment protects inmates from physical harm committed by fellow
inmates "resulting from the deliberate or callous indifference of prison officials to specific
known risks of such harm." Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987) (citing
Davis v. Zahradnick, 600 F.2d 458, 460 (4th Cir. 1979)). As the United States Supreme
Court has noted:

> Prison conditions may be restrictive and even harsh, but
> gratuitously allowing the beating or rape of one prisoner by
> another serves no legitimate penological objective, any more
> than it squares with evolving standards of decency. Being
> violently assaulted in prison is simply not part of the penalty
> that criminal offenders pay for their offenses against society.

Farmer v. Brennan, 511 U.S. 825, 833–34 (1994) (internal quotation marks and citations
omitted). For a prison official to be found liable under the Eighth Amendment for denying
an inmate humane conditions of confinement, "the official [must know] of and disregard[]
an excessive risk to inmate health or safety; the official must both be aware of facts from
which the inference could be drawn that a substantial risk of serious harm exists, and he

must also draw the inference." Id. at 837; see also Rich v. Bruce, 129 F.3d 336, 338 (4th Cir. 1997). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. See Farmer, 511 U.S. at 834, 837.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a 'serious or significant physical or emotional injury.'" Danser v. Stansberry, 772 F.3d 340, 346 (4th Cir. 2014) (quoting Farmer, 511 U.S. at 834). The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. 25, 36 (1993). Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "'deliberate indifference' to inmate health or safety." Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 302–03 (1991)). Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that the officials drew such an inference. Id. at 837. Where prison officials respond reasonably to a risk, they may be found not liable. Id. at 844.

Singfield alleges that during the three weeks he was housed in a cell with Keelz, he was terrified and unable to sleep, refractured his hand, suffered bumps and bruises, and became depressed. (Compl. at 3). Singfield alleges that he voiced his concerns to Defendants and cried out for help, but Defendants refused to move him from his cell. (Id. at 4). Instead, Defendants Roberts and Brennaman told Singfield and Keelz to deal with it

themselves. (Id. at 3). Additionally, Defendant Davis threatened Singfield with pepper spray if he complained again. (Id.).

Singfield's allegations find support in the medical records Defendants filed as an exhibit to their Motion. For example, Stratton's notes reflect that Singfield told her that he was not getting along well with his cell partner and that he had advised correctional staff about this matter. (Med. R. at 69). Stratton reported that she informed Defendant Smith about Singfield's concerns. (Id.). Mahler's medical notes from July 21, 2016, show that Singfield requested pain killers because his hand was hurting due to a physical altercation with his cell mate. (Id. at 70). On July 21, 2016, Carls reported that Singfield had sustained a left hand fracture several times in the last several weeks. (Id. at 67). Despite this evidence, Defendants uniformly deny that they were aware of Singfield's fears for his safety or that they denied him the medical care that he requested.

Singfield contests Defendants' statements through his own declaration affirming the truth of the statements in his Complaint. Combined with the evidence offered by the medical records, this evidence creates a genuine dispute of material fact. Specifically, there exist genuine disputes of material fact regarding whether Defendants knew Singfield was reasonably fearful of Keelz and thereafter acted with deliberate indifference to his safety and well-being by failing to investigate and respond to his concerns. See Farmer, 511 U.S. at 834; Danser, 772 F.3d at 346. Viewing the facts in the light most favorable to Singfield, these disputes "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." See Anderson, 477 U.S. at 250. Importantly, "[c]redibility determinations, the weighing of evidence, and the drawing of

21

legitimate inferences from the facts are jury functions, not those of a judge[.]" Id. at 255. For these reasons, the Court will deny summary judgment as to Singfield's failure to protect claims.

>        ii.        **Conditions of Confinement**

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. Rhodes v. Chapman, 452 U. S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." Id.

The same two-part Farmer inquiry set forth above applies to the analysis of Singfield's conditions of confinement. In addition, "to withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993).

Singfield alleges that he occupied a cell with feces smeared on the walls, that he was not provided a bed or toilet paper, and that he was fed "loaf." (Compl. at 4). Singfield does not, however, allege that he sustained any physical or emotional injury as a result of the three days during which he occupied the cell. While Singfield baldly alleges that he "suffered emotional distress," (Compl. at 4), "[t]he mere incantation of 'physical and mental injury,' . . . is inadequate to survive a motion for summary judgment," Strickler, 989 F.2d at 1381 n.9. Instead, "an inmate must specifically describe not only the injury but also its relation to the allegedly unconstitutional condition." Id. Singfield has not done so here. Accordingly, because Singfield has not alleged, much less proven, that he sustained

"a serious or significant physical or emotional injury resulting from the challenged conditions," Defendants' Motion will be granted as to this claim.

### iii.    Denial of Medical Care

To sustain a claim for denial of medical care under the Eighth Amendment, a plaintiff must show that the defendant's acts or omissions were done with deliberate indifference to a serious medical need. See Estelle, 429 U.S. at 106; see also Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quoting Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999)). Deliberate indifference to a serious medical need is defined as "treatment [that is] so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Accordingly, "[d]eliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). In a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." Danser, 772 F.3d at 346 n.8.

Disagreements between medical staff and an inmate over the necessity or extent of medical treatment do not rise to a constitutional injury and will not establish a cause of action under § 1983. See Estelle, 429 U.S. at 105–06. Moreover, the mere failure to treat all medical problems to a prisoner's satisfaction is insufficient to support a claim of

deliberate indifference. Peterson v. Davis, 551 F.Supp. 137, 146 (D.Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984).

Singfield asserts that after Keelz first assaulted him on July 5, 2016, Defendants Roberts and Brennaman refused his request to take him to the medical department. (Compl. at 3). In their declarations, Brennaman and Roberts deny that they refused to allow Singfield access to the medical department. (Brennaman Decl. ¶ 6; Roberts Decl. ¶ 6, ECF No. 14-18). Moreover, the medical records reflect that Singfield visited the medical department the following day. (Med. R. at 78–79).

Defendants are entitled to summary judgment on this claim. As an initial matter, Singfield has not alleged that he suffered a "significant injury" as a result of the July 5, 2016 assault. Indeed, Singfield provides no detail at all regarding the consequences of that particular assault. (See Compl. at 3). As a result, the Complaint has not provided sufficient information to create a genuine issue of material fact regarding whether Defendants were deliberately indifferent to a "serious medical need." In addition, given that Singfield visited a doctor and a registered nurse the following day, it is not clear that there was any significant delay in treatment. To the extent that treatment was delayed, it is not clear how this resulted in a significant injury. Nor does Singfield explain how the treatment he received was grossly inadequate. In the absence of any such allegations or evidence, the Court will grant summary judgment in favor of Defendants as to Singfield's claims that Roberts and Brenneman acted with deliberate indifference to his serious medical needs by refusing to take him to the medical department.

### 3.      First Amendment Retaliation

#### i.      Staff Alert

Singfield alleges that he was placed in a cell on staff alert in retaliation for filing an ARP. (Compl. at 4). "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Thus, an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. Booker v. S. Carolina Dep't of Corrs., 855 F.3d 533, 545 (4th Cir. 2017).

In order to set forth a colorable First Amendment retaliation claim under § 1983, a plaintiff must allege that: (1) the plaintiff "engaged in protected First Amendment activity; (2) the defendant[] took some action that adversely affected [plaintiff's] First Amendment rights; and (3) there was a causal relationship between [plaintiff's] protected activity and the defendant['s] conduct." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005) (citing Suarez Corp. Indus., 202 F.3d at 686).

According to Grant Haley's declaration, Singfield was not verbally abusive to prison staff. (Pl.'s Decls. at 2). Further, Haley told Wilson, who was escorting Singfield to the cell, that he and Singfield were enemies. (Id.). Wilson told Haley that he did not care whether the two inmates killed each other. (Id.). After Singfield refused the cell, Singfield was placed in a different cell on staff alert. (Id.; Alert Notice at 1).

Viewed in the light most favorable to Singfield, these facts are insufficient to show a causal relationship between the filing of his ARP and his placement on staff alert status. Further, Singfield does not allege with specificity that any Defendant participated in the decision to place him in the cell with Haley. Bare or conclusory assertions of retaliation are insufficient to establish a retaliation claim. See Adams v. Rice, 40 F.3d 72, 74–75 (4th Cir. 1994). Singfield's summary assertion of retaliation therefore does not create a genuine dispute of material fact. The Court will therefore grant Defendants summary judgment on this claim.

### ii.      Property Damage

Singfield next alleges that Defendant Smith retaliated against him for filing ARPs by directing two officers to "throw[] [his] property around [his] cell." (Compl. at 3). Singfield does not, however, allege that his property was damaged or provide any other facts to describe the harm he suffered as a result of the officers' actions. For purposes of a First Amendment retaliation claim, a plaintiff suffers adverse action where the defendant's conduct would "deter a person of ordinary firmness from the exercise of First Amendment rights." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (quoting Constantine, 411 F.3d at 500). Singfield's allegations are insufficient to make this showing. Accordingly, the Court will grant Defendants summary judgment on this claim.

### 4.      Qualified Immunity

Defendants assert that they are entitled to qualified immunity. (Defs.' Mem. at 23–24). Under the doctrine of qualified immunity, public officials who engage in unconstitutional conduct "may nevertheless be shielded from liability for civil damages if

their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (citation and internal quotation marks omitted). An officer violates a "clearly established" right when "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." Dist. of Columbia v. Wesby, 138 S.Ct. 577, 589 (2018) (citations and internal quotation marks omitted). "The burden of establishing a qualified immunity defense rests on the official asserting the defense." Wingate v. Fulford, 987 F.3d 299, 302 (4th Cir. 2021), as amended (Feb. 5, 2021) (citing Meyers v. Baltimore Cnty., 713 F.3d 723, 731 (4th Cir. 2013)).

At the heart of Singfield's claims is the allegation that Defendants acted with deliberate indifference to Singfield's health and welfare by refusing to move him to another cell to separate him from Keelz. (See Compl. at 3). In holding that qualified immunity does not shield a correctional officer defendant from a prisoner's failure to protect claim, the Fourth Circuit has explained:

> It has long been established that jail officials have a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other prisoners. Moreover, by 2011, we had made it clear that a prison official acts with deliberate indifference when he ignores repeated requests from a vulnerable inmate to be separated from a fellow inmate who has issued violent threats which the aggressor will likely carry out in the absence of official intervention.

Cox v. Quinn, 828 F.3d 227, 239 (4th Cir. 2016) (citations and internal quotation marks omitted). If Defendants did, in fact, engage in the alleged conduct, a reasonable official would have known that this conduct violated established law. Because this constitutional

right was clearly established by the relevant period in this case, Defendants are not entitled to qualified immunity.

### III.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 14) will be granted in part and denied in part. Summary judgment is denied as to Singfield's Eighth Amendment failure to protect claim and granted as to all other claims against Defendants. Singfield will be granted twenty-eight days to move for appointment of counsel to assist him in this matter. A separate Order follows.

Entered this 19th day of March, 2021.

_____/s/_____

George L. Russell, III
United States District Judge
